UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

SEA CARRIERS CORPORATION,

                    Plaintiff,                    04 Civ. 7395

         -against-                                OPINION

EMPIRE PROGRAMS INC. and
ROBERT A. MARTIN,

                    Defendants.

----------------------------------X

A P P E A R A N C E S:

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/26/08

          Attorneys for Plaintiff

          BECKER MEISEL LLC
          Eisenhower Plaza II
          354 Eisenhower Parkway, Suite 2800
          Livingston, New Jersey  07039
          By:  Joseph G. Harraka, Jr., Esq.


          Attorneys for Defendants

          LAW OFFICES OF ALLAN H. CARLIN
          708 Third Avenue, 22nd Floor
          New York, NY  10017
          By:  Allan H. Carlin, Esq.

**Sweet, D.J.**

Plaintiff Sea Carriers Corporation ("Sea Carriers" or the "Plaintiff") and Defendants Empire Programs, Inc. ("Empire") and Robert A. Martin ("Martin" or, collectively, the "Defendants") presented evidence in this non-jury diversity action on October 15, 16, 18, and 22-24, 2007. Final argument was held on December 10, 2007, at which time the action was considered fully submitted. Upon the following facts and conclusions, judgment will be entered in favor of the Defendants dismissing the First Claim, breach of contract, Third Claim, breach of fiduciary duty, Fourth Claim, seeking declaratory judgment, and Fifth Claim, constructive trust.

From the fall of 1998 through December 31, 2002, the parties engaged in a securities trading program that produced over $16 million of profit, which was divided 50-50 between them. It is the existence and division of a fund containing recoveries from enforcement actions and litigation against New York Stock Exchange specialist firms (In re NYSE Specialists Securities Litigation, No. 03 Civ. 8264 (RWS)) (the "Specialists Class Action") that is the principal financial incentive for this litigation.

Principally at issue is the characterization of the relationship between the parties. Sea Carriers has contended that the parties engaged in a joint venture; the Defendants contend that Sea Carriers functioned as an investment adviser. The facts relating to this issue and the activities of the parties are set forth below.

**FINDINGS OF FACT**

## i. **The Agreement**

Per G. Barre ("Barre") is the president and principal shareholder of Sea Carriers. Sea Carriers conducted business in the international shipping markets and offshore oil drilling rig markets from approximately 1993 to 1996. During that time, Sea Carriers developed informational systems, or "platforms," to evaluate and respond to market conditions in the international shipping industry and sought to develop computer programs to predict changes in freight rates. Because of the expense involved in acquiring the necessary data, the programs were determined to be unfeasible. From approximately 1996 to 1998, using similar techniques, Sea Carriers began developing similar platforms to be used in the securities industry.

Between 1996 and 1998, Barre incurred expenses and expended time to develop and design algorithms to be used in determining the most opportune time to buy and sell securities. Collectively, these algorithms comprised a proprietary, "system-based" trading platform for application in the public securities markets (the "Trading Program"). Barre also acquired computers, software, and historical price data and incurred expenses associated with developing and maintaining an office infrastructure to facilitate such research and development.

Barre conducted several series of simulated "paper trading" and "back testing" to evaluate the Trading Program's viability. By the spring or early summer of 1998, Barre had a high degree of confidence in the soundness of the Trading Program's basic methods and technology, but did not have sufficient capital to provide the Trading Program with the buying power it required.

In the early summer of 1998, Barre began to solicit a partner to underwrite and support the Trading Program.

The Trading Program contained four key components: (i) the trading system itself; (ii) speed to the market, i.e.

connectivity; (iii) a price data feed to implement the programs of the trading system; and (iv) low commission rates.

Barre initially met Martin in the early 1990's, when Martin worked for Dean Witter and traded commodities for Barre's personal Dean Witter brokerage account. In mid-1998, Barre was re-introduced to Martin by a mutual friend. After reestablishing contact with Martin, Barre met with him several times in person to discuss the possibility of forming a business relationship in connection with the Trading Program.

During these meetings, Barre and Martin discussed the day-to-day demands of a securities trading operation using the Trading Program, along with the related technical and capital requirements needed to achieve maximum profitability. Martin was experienced and knowledgeable in securities markets and had available capital to invest. Martin stated to Barre that he possessed the requisite knowledge, skill, and business connections to ensure that the parties' venture, once formed, would be adequately capitalized, whether by himself or through other investors, and that he could manage the venture's buying power by monitoring a brokerage account, the broker relationship, including commission rates, and the complexities of margin requirements that would be applicable to the account.

In June 1998, at a meeting a restaurant attended by

Barre, Martin and Martin's son, Alan Martin, Barre and Martin

agreed that Barre would trade securities, utilizing the Trading

Program, in a brokerage account to be opened by Martin at Spear

Leeds & Kellogg ("SLK") (the "Agreement"). Barre entered into

the Agreement on behalf of Sea Carriers Corporation and Martin

on behalf of Empire Programs Inc.[1] The Agreement was verbal, and

Barre and Martin agreed that trading profits and trading

expenses would be split 50-50 between them, that Martin would

deposit approximately $200,000 in the SLK account, and that

Barre would provide all equipment and facilities necessary for

trading. No additional obligations were undertaken by either

party as part of the Agreement, and the Agreement could be

terminated by either party at any time.

The Agreement did not contain a provision for the

parties to jointly own any property, in either equal or unequal

shares. In testifying about why he agreed to the opening of the

SLK account in the sole name of Empire Programs Inc., Barre

said, "The issue I had was if Sea Carrier[s] was going to be a

joint holder here, I also knew that Sea Carrier[s] had to

license its technology. Even at this time that was a fairly big

---

[1] In 1976, Martin incorporated Empire Programs Inc. in Delaware, but the state revoked that company's charter in 1979. Martin continued for decades to do business as "Empire Programs Inc."

project. It would have required me to spend 2, 3, perhaps 4 weeks to put all those files together, notwithstanding the cost associated with that." Trial Tr. 47:12-23, Oct. 15, 2007.

The parties agreed that Empire would contribute the initial trading capital and assume the bookkeeping and financial reporting responsibilities, and Sea Carriers would contribute its office infrastructure to facilitate trading, the exclusive use of the Trading Program, trading connectivity, computers, and data feed, and would develop and refine the trading system as required. Empire also agreed to fund the securities trading account with sufficient capital.

On June 18, 1998, a brokerage account was opened by "Robert A. Martin" as "Customer," with the title of the account placed in the sole name of Empire Programs, Inc. Martin was the sole signatory to the Customer Agreement for the SLK account (the "Customer Agreement"). Martin had exclusive control over all distributions from the SLK account.

The Customer Agreement provided, among other things, that all of the Customer's property held by SLK or carried in the Customer's accounts was subject to a continuing security interest for payment of all of the Customer's obligations to

6

SLK, and that SLK would have all the rights and remedies of a secured creditor under the Uniform Commercial Code. The Customer Agreement further provided that "SLK reserves the right to sell any property in Customer's account . . ., to buy any property which may be short in such accounts and/or to cancel all outstanding transactions and to offset any indebtedness in such accounts against any other of Customer's accounts . . . and Customer shall be liable to SLK for any loss or costs sustained." Pl.'s Ex. 4. Pursuant to the Customer Agreement, Martin was solely responsible for the payment of margin loans on the SLK account.

## ii.     **Trading Activities**

Martin authorized Sea Carriers to start trading in the SLK account by providing Barre with the account's access password. In addition, in June 1998, Martin ordered computer equipment from SLK for delivery to Sea Carriers' offices in Greenwich, Connecticut, to facilitate the parties' trading operations.

In addition to the initial deposit of $200,000, Martin also made deposits of $110,000 and $600,000 into the SLK account. Neither Sea Carriers nor Barre made any deposits into

the SLK Account. Throughout the parties' relationship, Martin
also generally left more than 50% of his share of the net
trading profits generated in the SLK account, thereby increasing
the equity of the account. The maximum amount of capital in the
SLK account during the trading relationship of the parties
amounted to approximately $8,000,000.

Margin loans largely funded the buying power of the
SLK account and amounted to as much as $12,000,000. There were
numerous margin calls on the SLK Account during the parties'
relationship. Martin and Alan Martin paid in excess of
$1,750,000 for these margin calls, one of which was for
$751,000.

On September 2, 1998, Martin sent a note to Barre in
which he enclosed a $50,000 check from Empire Programs Inc. to
Sea Carriers. The note stated:

Reference is made to our joint venture for trading
various equity and futures instruments.
We are enclosing herewith our check in the amount of
$50,000 as an advance on account of trading profits.

Pl.'s Ex. 8. Barre signed the letter under a typed line
reading "Check Received" and returned it to Martin.

In a second September 2, 1998, letter to Barre, Martin also identified commitments for the building of the trading operation that were to be paid by the "joint venture," including the addition of personnel. Martin also referred to the possibility of adopting a future medical plan and 401(k) plan "as our joint venture evolves." Pl.'s Ex. 6.

On September 29, 1998, Empire reimbursed Sea Carriers for the expenses it incurred in connection with the parties' trading operation between July and September 1998.

Various assets of Sea Carriers were utilized in connection with the trading operations for the SLK account, including office space, computers, the Trading Program, data feeds and other office equipment. Barre did not assign ownership of the Trading Program to Sea Carriers, nor was it included as an asset on any of Sea Carriers' income tax returns. None of the lease or subscription obligations in the sole name of Sea Carriers was guaranteed by Martin.

Similarly, Martin's acquisitions or leases of computer equipment for use in the trading operation for the SLK Account were made in Empire's sole name. None of these leases in Empire's name was guaranteed by Sea Carriers.

No assets or liabilities were held in the joint names of the parties.

Sea Carriers "traded approximately 4.5 billion shares of stock in the SLK account between August [1998] and December 2002." Trial Tr. 149:18-21, Oct. 16, 2007. As acknowledged by Barre, Sea Carriers traded a managed account for Empire, and the actual trading in the SLK account was done by Sea Carriers utilizing its proprietary trading program. Id. at 147:24-148:17; 217:3-10. Barre personally monitored and supervised all trading.

Until late 2000 or early 2001, Barre was the only trader for Sea Carriers. Thereafter, Sea Carriers engaged traders as independent contractors, all of whom were trained by Barre. Additionally, commencing in 2001, Alan Martin traded for the SLK account from Sea Carriers' offices utilizing the Trading Program. Barre had sole control over the programming of the Trading Program system, and it was secured against unauthorized access by password protection under Barre's control. When Barre hired a programmer as a consultant for Sea Carriers to work on the efficiency of the trading program, he did not seek reimbursement for any portion of the programmer's compensation from Martin or Empire.

The Trading Program, as directed by Barre, consisted of a series of complex algorithms which "calculated very sophisticated inefficiencies in the market" and "gave the trader a visual sign when to buy and sell." Trial Tr. 150:18-19, Oct. 16, 2007. The system visually displayed on a computer monitor a basket of stocks that the trader could buy or sell, with the algorithms having calculated both "the market at any given time" and the "performance of the trader." Id. at 151:20-23. Each basket of securities was constantly updated and changed "within seconds" by the trading system. Id. at 151:1-6. Although the trader decided whether to buy and sell, "the computers told the trader what to buy and sell . . . ." Id. at 153:5-8. Each trade involved approximately 10,000 shares of the basket of stocks.

Apart from the "basket that [Sea Carriers] actually traded," the SLK account also maintained a separate "conversion basket" of securities. Trial Tr. 58:21-25, Oct. 15, 2007. This conversion basket constituted a "long position" in the SLK account and consisted of shares of particular stocks, "put" options for those stocks, and "call" options for those stocks. As a result of ownership of this three-part "conversion," the SLK account could hold a long position without any significant upside or downside risk. Traders utilizing Barre's proprietary

11

program could then sell shares against this long position. In the absence of this long position, the Sea Carriers traders would have been required to comply with regulations which prohibited the short sale of securities without an "uptick."

After consultation with Barre as to the stocks Barre wanted covered with conversions, Martin arranged for the purchase of the three-part "conversion" by contacting the "conversion desk" at SLK. Trial Tr. 431:10-16, Oct. 18, 2007. These conversion securities were not traded, but were held and remained in place in the SLK account until the end of the option period, generally ninety days. Profits and losses from transactions in the conversion basket were accounted for separately from transactions in the trading basket throughout the term of the parties' relationship, and were insignificant as compared to the trading results obtained from utilization of Barre's proprietary trading program. For example, in 2002, the "conversion basket" yielded a total profit of $10,946.98, as compared to $7,336,922.43 from the trading basket utilizing Barre's program. Pl.'s Ex. 88.

Alan Martin prepared reports (the "Operational Summaries") reflecting the results of the daily, monthly, and annual trading activities in the SLK account, including trading

12

results and expenses that were deducted in calculating the
amount of net profits to be distributed to the parties. Copies
of these Operational Summaries were regularly delivered by Alan
Martin to Barre as they were prepared.

In addition, Alan Martin testified that he regularly
distributed to Barre the first few pages of the SLK monthly
account statements, reflecting a summary of account information
and the monthly trading activity. Given the volume of trading
in the SLK account, the SLK monthly statements consisted of
thousands of pages.

The Operational Summaries reflected that the SLK
account generated net trading profits approximating $16,000,000
from the inception of trading through the termination of the
agreement as of December 31, 2002, of which a total of
$8,095,000 was distributed to Sea Carriers.

Susan Butler ("Butler"), office manager for Sea
Carriers, requested that Martin pay only $1,050,000 of the net
trading profits to Sea Carriers, and that the balance of
$7,045,000 be paid directly to Barre. Martin issued payments of
net trading profits to Sea Carriers and Barre in the allocations
requested by Butler on a regular basis, with a number of checks

issued for such distributions to Sea Carriers bearing the
notation "Consulting Fees." Trial Tr. 230:5-234:7, Oct. 16,
2007.

Butler requested that Martin distribute to Sea
Carriers only sufficient net trading profits to cover Sea
Carriers' expenses, and she purposefully never requested
distribution to Sea Carriers of enough money for Sea Carriers to
have a profit in any given year. Trial Tr. 756:12-17, Oct. 23,
2007. Sea Carriers received the following payments from net
trading profits and reported the following losses on its income
tax returns during each year of the parties' relationship:

| Year | Net Profit Distribution | Loss on Tax Returns |
| --- | --- | --- |
| 1998 | $125,000 | ($ 8,559)(Def.'s Ex. SS) |
| 1999 | $ 95,000 | ($17,551)(Def.'s Ex. A) |
| 2000 | $240,000 | $0.00(Def.'s Ex. UU) |
| 2001 | $240,000 | ($28,320)(Def.'s Ex. VV) |
| 2002 | $350,000 | ($18,287)(Def.'s Ex. LL) |

Consequently, Sea Carriers had a negative net worth throughout
the approximate four and one-half year period during which the
parties maintained their relationship, with Sea Carriers'
current liabilities substantially exceeding its total assets.

14

According to the testimony of Leonard Rosen, the
accountant in charge of preparing Sea Carriers' income tax
returns, Sea Carriers, a "C" corporation for tax purposes, would
have had to pay income taxes on the net trading profits
distributed to Barre if there was a joint venture. Trial Tr.
578:25-579:9, Oct. 22, 2007.

On a monthly basis, Butler submitted to Martin a
report of Sea Carriers' expenses relating to the trading
operation, which included subscriptions and payments due under
the lease. Martin reviewed such expenses and issued checks to
Sea Carriers in reimbursement, usually within a few days of
receipt. All such reimbursements were made by checks issued
from the account of Empire Programs Inc., over which Martin was
the sole signatory and over which he had sole control.

From the inception of the parties' relationship
through December 31, 2002, an aggregate of $1,050,092 of the
parties' trading expenses were paid based upon these procedures,
including all expenses for which Sea Carriers had sought
reimbursement from Martin.

According to the Operational Summaries, Sea Carriers
and Barre were overpaid the Sea Carriers share of net trading

profits and were in a deficit position at the end of 2001,
principally as a result of trading losses in October and
December 2001. The following schedule was prepared by Alan
Martin based upon the Operational Summaries and records relating
to the dates of distributions of net trading profits:

| Month/Year | Trading Result | Expenses | Net Monthly Result | Barre/Sea Carriers Overpayment |
|---|---|---|---|---|
| Oct 01 | ($81,763.51) | ($80,954.51) | ($162,718.02) | ($24,597.07) |
| Nov 01 | $50,336.19 | ($36,925.02) | $13,411.17 | ($210,489.77) |
| Dec 01 | ($130,671.82) | ($54,625.95) | ($185,297.78) | ($315,700.88) |
| Jan 02 | $71,353.00 | ($71,045.04) | $307.96 | ($293,624.89) |

Def.'s Ex. TP.

Based upon this deficit position, Martin made no net
profit distributions to Barre or Sea Carriers for a period of
approximately six continuous months, commencing November 4,
2001. This deficit was carried forward and was offset against
net trading profits in the ensuing months of 2002 and
distributions of net trading profits to Barre and Sea Carriers
resumed on May 7, 2002. Def.'s Ex. R.

Butler did not make any requests for the payment of
net profit distributions for this six-month period. Tr. 912:20-
913:6. Barre acknowledged this deficit position in an affidavit
filed in this action in February 2005 ("As Mr. Martin contends,
at certain points Sea Carriers and I were 'in a deficit position

16

to Empire . . . based primarily on trading losses that were incurred in October and December 2001.' Although no direct 'payment' was made by me or Sea Carriers to Empire to cover those losses, they were deducted from subsequent profitable distribution periods."). Def.'s Ex. 0, ¶17.

Sea Carriers continued to request reimbursement from Martin on a monthly basis for all of its expenses incurred in connection with the trading operations.

In February 2002, without Martin's knowledge, Barre met with Randy Frankel ("Frankel"), a partner at SLK, for the purpose of raising capital from Frankel.

In April 2002, after no net profit distributions had been made to Barre for almost six months, Barre requested that Martin advance $1,000,000 to him. Barre purportedly needed these funds for payment of income tax obligations. Martin declined to make this advance.

### iii. **Sea Carriers LP**

In late summer 2002, Barre engaged Victor Zimmerman, Esq. ("Zimmerman") to form Sea Carriers LP, the general partner

17

of which was a limited liability company under Barre's sole control, Sea Carriers Management LLC ("Sea Carriers Management"). All of Zimmerman's services for this work were billed to Sea Carriers Corporation, commencing September 2, 2002, and continuing through December 2002. However, Sea Carriers did not request reimbursement from Martin.

On September 11, 2002, Zimmerman contacted an examiner in the Department of Banking of the State of Connecticut to discuss the experience requirements for investment adviser registration with regard to Barre and Sea Carriers Management. Zimmerman concluded that it would be necessary for Barre and Sea Carriers Management to register as an investment adviser under the laws of Connecticut if Sea Carriers LP was located in Connecticut and had less than $25 million in capital. In addition, Zimmerman advised Barre that he would have to take a "Series 65" examination in order to register as an investment adviser in Connecticut.

On June 9, 2003, Sea Carriers Management filed an application to set up a user account for the electronic filing of an application to be registered as an investment adviser. However, neither Sea Carriers Management nor Barre thereafter filed an application to register as an investment adviser, and

Barre did not take the Series 65 exam.  Sea Carriers Corporation
did not file an application to register as an investment
adviser.

During the fall of 2002, Martin pursued funding for
additional trading capital from outside investors for the
benefit of both Barre and himself and advised Barre of his
prospective meetings with potential investors, including Randy
Frankel.

Barre did not advise Martin or Alan Martin of Sea
Carrier LP's structure until November 19, 2002, when Barre
presented Martin with a copy of an October 2002 draft of the
offering memorandum.  Prior to November 19, Barre met with
prospective investors in Sea Carriers LP, including two
investors who directly or indirectly invested approximately
$14,000,000 in Sea Carriers LP.  Neither Martin nor Alan Martin
was invited to any meetings with prospective Sea Carriers LP
investors.

## iv.    The Lichtenstein Account

In October 2001, Barre entered into an agreement with
Ben Lichtenstein and they opened a joint account at Rosenthal

19

Collins (the "Lichtenstein account") for trading commodities on the Chicago Mercantile Exchange ("CME"). Martin was not a party to the customer agreement for this account and was not a party to the agreement with Lichtenstein. Martin testified that he was not in favor of opening this CME account with Lichtenstein, but that Barre insisted on doing so.

At Barre's request, Martin sent $75,000 from the SLK account to fund the Lichtenstein account. After a $25,000 loss in the Lichtenstein account was incurred, Martin advised Barre in April 2002 that he was terminating his financial involvement in the account and that he would share the $25,000 trading loss equally with Barre.

Barre continued to maintain the Lichtenstein account. By December 2002, the account had remaining capital of less than $12,000, and by February 2003, virtually all of the capital invested in the account (the $75,000 initially invested) was lost.

## iv. **Termination**

The parties' relationship terminated at the end of December 2002, and Sea Carriers LP reimbursed Sea Carriers for

the expenses relating to the trading operations which had
previously been reimbursed by Martin, including office rent and
computer lease payments.

By letter dated January 13, 2003, Martin advised Barre
that he did not wish to invest in Sea Carriers LP as a limited
partner and requested that Barre make the Trading Program
available to him and his son for continued trading, subject to
Barre's right to share in the net trading profits.  Barre did
not make the Trading Program available to the Martins.

During the entire period from August 1998 through
December 2002, Barre did not refer to the relationship between
Sea Carriers and Empire or Martin as a joint venture in any
documents.

Martin described his relationship with Sea Carriers or
Barre as a joint venture approximately twenty-six times before
termination of their agreement on December 31, 2002, without
having been aware of the legal criteria of a joint venture.  On
at least seven occasions between 2000 and 2002, Martin used the
words "consulting fees" or "consultant fees" to describe their
relationship on all of the checks issued to Sea Carriers for net
profit distributions and those checks were deposited without

21

alteration by Sea Carriers. Butler handwrote "consulting fees" in attributing $80,000 to Sea Carriers of a $200,000 check issued by Martin to Barre. Def.'s Exs. 161, 162 and 163.

At no time did Martin refer to Sea Carriers or Barre as a co-owner of the SLK account or refer to a joint venture relationship with Sea Carriers or Barre in any communications with SLK. Martin never sought credit from any third party based upon a representation that a joint venture existed with Sea Carriers or Barre, and he never referred to himself or Empire as a co-owner of Barre's proprietary trading program.

After becoming aware of the legal criteria for a joint venture in 2004, Martin did not refer to his relationship with Sea Carriers or Barre as a joint venture.

Following the termination of their relationship, Sea Carriers and Empire proceeded to settle accounts for the year 2002 through an exchange of correspondence from January 2003 through May 2003. In a March 5, 2003, memo to Butler, Martin stated:

[] Empire ceased to participate in the trading on Dec. 31, 2002. We believe the hedge fund succeeded to our position.

Since that time we have continued to pay on behalf of
Sea Carriers the computer lease payments that are
being utilized by Sea Carriers hedge fund. So far, we
have charged those against Per's remaining credit
balance.

On Thursday I hope to resolve with Per the new
computers that he needs and for Sea Carriers to take
over the computer lease payments on the equipment that
is being used for the hedge fund trading.

I hope this is helpful for you.

Pl.'s Ex. 181.

## CONCLUSIONS OF LAW

Upon the facts found above, there is diversity

jurisdiction over the action under 28 U.S.C. § 1331.

## i.     The Plaintiff Has Not Established a Joint Venture Between the Parties

Under New York law, establishment of a joint venture

requires the following five elements:

(1) two or more persons must enter into a specific
agreement to carry on an enterprise for profit; (2)
their agreement must evidence their intent to be joint
venturers; (3) each must make a contribution of
property, financing, skill, knowledge or effort; (4)
each must have some degree of joint control over the
venture; and (5) there must be a provision for the
sharing of both profits and losses.

23

Dinaco, Inc. v. Time Warner, Inc., 346 F.3d 64, 67-68 (2d Cir.

2003). All of these elements must be present in order for a

joint venture to have been formed. Kidz Cloz, Inc. v.

Officially for Kids, Inc., 320 F. Supp. 2d 164, 171 (S.D.N.Y.

2004) ("The absence of any one factor is fatal to the

establishment of a joint venture.") (internal quotation marks

and citation omitted).

A plaintiff seeking to establish a joint venture must

prove "more than a simple contractual relationship." Zeisling

v. Kelly, 152 F. Supp. 2d 335, 347 (S.D.N.Y. 2001). As set

forth in Steinbeck v. Gerosa, 151 N.E.2d 170, 179 (N.Y. 1958):

An agreement to distribute the proceeds of an
enterprise upon a percentage basis does not give rise
to a joint venture if the enterprise does not
represent a joinder of property, skills and risks.
The ultimate inquiry is whether the parties have so
joined their property, interests, skills and risks
that for the purpose of the particular adventure their
respective contributions have become as one and the
commingled property and interests of the parties have
thereby been made subject to each of the associates on
the trust and inducement that each would act for their
joint benefit. . . . [I]t is not enough that two
parties have agreed to act in concert to achieve some
stated economic objective. Such agreement, by itself,
creates no more than a contractual obligation . . . .

(internal quotation marks and citations omitted).

*a. Sharing of Profits and Losses*

Here, the Agreement governing the relationship of the parties did not contain a provision for the sharing of losses. Those who attended the meeting where the Agreement was negotiated and agreed upon, namely Barre, Martin, and Alan Martin, testified that the subject of sharing of losses was not discussed and that the Agreement did not include a provision pursuant to which the parties agreed to "submit to the burden of making good the losses," an "indispensable essential" of a joint venture. Dinaco, Inc., 346 F.3d at 68.

In Kidz Cloz, 320 F. Supp. at 175, the court noted that the plaintiff's deposition testimony similarly reflected that "the parties never discussed what would occur in the event of a loss." In that case, the Honorable Denny Chin concluded that "as the parties had never even discussed losses, certainly they did not have an agreement to share losses," and, therefore, "this 'indispensable essential of a contract of partnership or joint venture' is missing, as a matter of law.'" Id. (quoting Steinbeck, 151 N.E.2d at 178); see also Precision Testing Labs. v. Kenyon Corp. of Am., 644 F. Supp. 1327, 1349 (S.D.N.Y. 1986) (noting that in the absence of an understanding regarding the

sharing of profits and losses, "this essential element of a
joint venture agreement was not present.").

Sea Carriers has contended that there was an agreement
to share losses based upon its having entered into, in its own
individual name, fixed multi-year leases which expired after the
parties' agreement terminated on December 31, 2002.

However, in Brown v. Cara, 420 F.3d 148 (2d Cir.
2005), the Second Circuit rejected a similar claim made by a
plaintiff claiming a joint venture in the absence of an explicit
agreement to share losses. In that case, the plaintiff ("JMB")
contended that a Memorandum of Understanding ("MOU") constituted
a joint venture agreement, and in rejecting that claim, the
Second Circuit stated:

[W]hile paragraphs seven and eight of the MOU provide
for a division of the proceeds, and paragraph eleven
describes how that division would be adjusted if
equity partners are sought instead of, or in addition
to, debt financing, there are no equivalent sections
that provide for a sharing of losses. JMB claims that,
if the [p]roject failed, JMB would lose the money and
resources committed to the rezoning effort. The text
of the MOU does not support that claim. According to
the MOU, JMB agrees to "front" $175,000 for the "costs
of development." However, there is nothing in the MOU
to indicate who would be responsible for any money
fronted by JMB and subsequently lost. Similarly,
while the MOU contemplates each of the party's taking
responsibility for the compensation of named
consultants, the MOU does not indicate that these
expenses cannot be recouped later when the [p]roject

succeeds or fails. Without such an assurance, the MOU
cannot be read as providing for a division of losses.

Id. at 160.


Moreover, the argument that Sea Carriers' financial
obligations under fixed multi-year leases after termination of
the parties' agreement constituted an agreement to share losses
is contrary to the evidence.


No evidence supports the contention that any entity
other than Sea Carriers agreed to pay any liability under any of
the leases or other long-term obligations entered into by Sea
Carriers. As found above, after Sea Carriers voluntarily
terminated the agreement of the parties at the end of 2002 in
favor of the establishment of Sea Carriers LP, all of the
expenses under such continuing lease obligations were reimbursed
to Sea Carriers by Sea Carriers LP throughout 2003.


Consistent with the absence of any understanding
concerning joint ownership of assets, as set forth above, all of
the assets utilized by the parties in connection with the
trading activities were acquired or leased in the parties'
individual names, not their joint names, with neither party even
guaranteeing the performance of any lease obligations of the

other party. None of these assets was ever transferred to the joint ownership of the parties. In light of the fact that no property was held in the joint names of the parties, no basis exists for implying an agreement to share losses. Cf. Brown, 420 F.3d at 160 (finding no basis for reliance on formation of jointly owned corporation as establishing a joint venture in the absence of a "clear commitment to jointly own" the property to be developed by the corporation).

Furthermore, consistent with the absence of any agreement to share losses, the undisputed evidence shows that Butler, with Barre's knowledge, requested that $7,045,000 of the $8,095,000 of net profit distributions to be paid to Sea Carriers be paid to Barre personally, and that only $1,050,000 be paid to Sea Carriers. As a consequence of this allocation of payments, Sea Carriers had a negative net worth throughout the relationship of the parties. This allocation of net profit distributions and Sea Carriers' consequent negative net worth rebut the claim that Sea Carriers had an obligation to pay for the losses of the alleged venture, particularly given Martin's sole liabilities under the SLK account Customer Agreement for payment of margin loans.

Additionally, during the six-month period between

November 2001 and May 2002, when Sea Carriers and Barre were in

a deficit position with respect to net profit distributions, Sea

Carriers and Barre did not make any payments against this

deficit. Instead, this deficit was carried forward and was

offset against future net trading profits. Moreover, during the

six-month deficit period, Sea Carriers continued to request, and

received, full reimbursement for all of its trading expenses

from Martin.

In Vitale v. Steinberg, 764 N.Y.S.2d 236 (App. Div.

2003), the court found that an employer-employee profit-sharing

plan did not include an agreement to share losses merely by

virtue of its paying benefits out over a multi-year period and

allowing for the offsetting of benefits in one year by the

losses sustained in another year. The court stated:

Under the plan's multi-year determination and payout
of benefits, the profits of prior years could be
offset by losses from a later year, but losses could
only reduce the amount of benefits participants might
receive, as far down as zero benefits, and the plan
never required participants to contribute to make good
on negative amounts, i.e., losses. The computation of
profits, even within one particular year, necessarily
entails the addition of income and the subtraction of
expenditures, a fact made clear in the plan's
definition of "pretax operating profit"; thus, only in
the broadest sense are losses "shared." That
expansive interpretation, however, renders meaningless
a distinction between "sharing profits" and "sharing
profits and losses," a difference which has never been

treated as academic. The fact that, under the plan's
provisions, losses from a prior year may be included
in the calculation of profits over a multi-year
benefit period does not convert the profit-sharing
system into one in which losses are shared. There is
no requirement at law that the calculation of profits
be confined to one calendar or fiscal year, and the
parties were free to fashion a calculation covering
several plan years.

Id. at 237-38 (internal citations omitted).

As in Vitale, the parties here were free to fashion a
plan for distribution of profits, and they adopted a procedure
for the "regular" distribution of net profits, when requested by
Susan Butler, as opposed to distributions on a date certain or
at specified intervals. Indeed, as reflected by the absence of
any payments by Sea Carriers or Barre to Martin while Sea
Carriers was in a deficit position between November 2001 and May
2002, and as further reflected by Martin's continued
reimbursement payments to Sea Carriers during that period, the
parties here only had a plan for the sharing of profits, not
losses.

Sea Carriers has also contended that the division of
trading losses between Martin and Barre, in their individual
capacities, from the Lichtenstein account reflected an agreement
between Sea Carriers and Martin to share losses under their 1998
agreement. However, the Lichtenstein account was not opened by

Pl.'s Ex. 202.

These actions regarding the Lichtenstein Account do not create, three and one-half years after-the-fact, an agreement to share in losses incurred in connection with the trading activities in the SLK account.

Based upon the foregoing, there was no express or implied agreement to share losses. Accordingly, the plaintiff has failed to establish this indispensable element of a joint venture.

*b. Parties' Intent to Enter into a Joint Venture*

In order to prevail upon its joint venture claims, Sea Carriers must establish that the parties intended to enter a joint venture by "point[ing] to language in the agreement or extrinsic evidence establishing intent to form something other than a contractual relationship to operate a company." DIRECTV Group, Inc. v. Darlene Invs., LLC, 05 Civ. 5819 (WHP), 2006 U.S. Dist. LEXIS 69129, at *17-18 (S.D.N.Y. Sept. 27, 2006); see also Precision Testing, 644 F. Supp. at 1349.

the same parties as the parties to the Agreement and was opened in October 2001, more than three years after Sea Carriers entered into the Agreement. The facts and circumstances surrounding the Lichtenstein account are unrelated to the Agreement between the parties. As Barre testified, the agreement to open the Lichtenstein account was separate from the alleged joint venture agreement, and was, in his words, "a joint venture with the joint venture." Tr. 90:3-10, Oct. 15, 2007.

When Martin ended his financial involvement in the Lichtenstein account in April 2002 and agreed to charge one-half of the trading loss therein against his share of the net profits generated in the SLK account, Martin withdrew his investment, stating in a memo to Barre dated April 8, 2002:

...I wanted to make you aware of the following:

1.    This week we are charging Empire and Per/Sea Carriers for the Ben Lichtenstein trading losses through the conclusion of his first membership lease. The loss at that time ($25,000) will reflect a charge to each of us of $12,500.

    In accordance with previous discussions in which you informed us that you desire to continue the trading with Ben, we are charging your account the additional $50,000 that we advanced. Therefore, all of the money in the Per/Ben L. account now belongs to you....

31

The verbal agreement between the parties here and their course of conduct during the term of their agreement does not evince a mutual intent to be joint venturers. Sea Carriers' profit participation in the trading activities in the SLK account, without any proprietary interest in the SLK account, is insufficient to establish a joint venture. See, e.g., Rivkin v. Coleman, 978 F. Supp. 539, 544 (S.D.N.Y. 1997); Steinbeck, 151 N.E.2d at 178.

In an effort to demonstrate that the parties intended to form a joint venture, Sea Carriers has relied heavily on Martin's description of Empire's relationship with Sea Carriers or Barre as a joint venture, co-venture, or partnership in correspondence between the inception of their relationship in 1998 and commencement of the Specialists' Action in 2004. However, describing an entity as a joint venture does not in itself establish a joint venture. Cf. Kyle v. Brenton, 584 N.Y.S.2d 698, 699 (App. Div. 1992) ("The fact that the parties held themselves out as partners is not decisive; calling an organization a partnership does not make it one.") (citing Brodskey v. Stadlen, 526 N.Y.S.2d 478, 480 (App. Div. 1988). As the Honorable Charles S. Haight has noted, "'[a] duck which is called a horse does not become a horse; a duck is a duck.'" Bailey v. Broder, No. 94 Civ. 2394 (CSH), 1998 U.S. Dist. LEXIS

301, at *4 (S.D.N.Y. Jan. 15, 1998) (quoting 1 Bromberg and
Ribstein on Partnership § 2.05(c) (1996)).

Even if Martin's descriptions of the parties'
relationship as a joint venture could be viewed as evincing an
intent to be a joint venturer, the evidence that has been
presented does not show that this intention was mutual on the
part of Sea Carriers. No evidence was presented that Sea
Carriers held itself out to be a joint venture partner with
Empire at any time during the period when the parties conducted
trading activities. No reference is made to a joint venture
relationship with Empire or Martin in the Confidential Offering
Memorandum used by Barre to solicit investments for Sea Carriers
LP in the Fall of 2002, prior to the termination of the parties'
agreement.

The allocation of net profit payments between Sea
Carriers and Barre belies any intention to form a joint venture
with Empire or Martin. As noted above, Butler, with Barre's
knowledge, requested that Martin pay only $1,050,000 of the net
trading profits to Sea Carriers, and that the balance of
$8,045,000 be paid directly to Barre. If there was a joint
venture, all of this income would have been paid to Sea
Carriers, and, as Sea Carriers' accountant testified, all of

34

this income would have been reported on the income tax returns of Sea Carriers.

Moreover, during the six-month period when Sea Carriers and Barre were in a deficit position, Sea Carriers submitted all of its monthly expenses to Martin for reimbursement and accepted Martin's reimbursement payments. Additionally, Barre demanded current distributions of the net trading profits to him and/or Sea Carriers, often more than once a month, rather than leaving the majority of the net trading profits in the SLK account.

In addition, the SLK account was held in the sole name of Martin and only Martin had the right to withdraw funds from the SLK account. Martin was solely responsible for the substantial margin loans on the SLK account, and none of these margin loans was guaranteed by Sea Carriers. Martin and his son Alan paid in excess of $1,750,000 for margin calls on the SLK account, with no contribution from Sea Carriers or Barre, despite Barre having been aware of at least some of these margin calls, including one for $751,000.

Based upon the foregoing, the evidence is insufficient to support Sea Carriers' joint venture claim. Accordingly, the

35

first cause of action, claiming a breach of the alleged joint venture agreement, and the fourth cause of action, seeking a declaratory judgment with respect to the joint venture agreement, are dismissed.

## ii.    The Breach of Fiduciary Duty Claim is Dismissed

Sea Carriers' third cause of action, breach of fiduciary duty, is predicated on an alleged fiduciary relationship between the parties arising from their relationship as co-venturers under the alleged joint venture. See Am. Compl. ¶ 38 ("As a result of the parties' Joint Venture agreement, and their relationship as co-venturers, Martin owed Sea Carriers a fiduciary duty of the utmost loyalty and confidence."); Pl.'s Concl. of Law ¶ 101 ("Parties engaged in a joint venture owe each other a fiduciary duty of the utmost good faith, loyalty and fair dealing.").

In light of the absence of a joint venture, no fiduciary relationship existed between the parties, and therefore, there was no breach of fiduciary duty. See, e.g., Accent Assocs., Inc. v. Whealley Constr. Corp., 701 N.Y.S.2d 667, 667 (App. Div. 1999).

### iii.   **The Constructive Trust Claim is Dismissed**

Under New York law, "though as an equitable doctrine
its application to particular circumstances is susceptible of
some flexibility," in order to establish a constructive trust
claim, there generally must be proof of: (1) a confidential or
fiduciary relation, (2) a promise, express or implied, (3) a
transfer made in reliance on that promise, and (4) unjust
enrichment. Bankers Sec. Life Ins. Soc'y v. Shakerdge, 406
N.E.2d 440, 440-41 (N.Y. 1980) (citations omitted); see also
Cerabono v. Price, 775 N.Y.S.2d 585, 585 (App. Div. 2004).

In view of the absence of a fiduciary relationship
between the parties, the plaintiff's constructive trust claim is
legally insufficient. See Rosenblatt v. Christie, Manson &
Woods Ltd., No. 04 Civ. 4205 (PKC), 2005 U.S. Dist. LEXIS 23816,
at *37 (S.D.N.Y. Oct. 14, 2005) ("Where equity does not demand
deviation from these requirements, "the absence of the requisite
confidential relationship defeats plaintiff['s] efforts to
impose a constructive trust.'") (quoting Waldman v. Englishtown
Sportswear, Ltd., 460 N.Y.S.2d 552, 556 (App. Div. 1983))
(internal citations omitted).

**iv.**      **Sea Carriers' Claim for $57,000 in Unpaid
Distributions is Not Properly Before the Court**

In its original complaint in this action, Sea Carriers
sought "an accounting as to the profits and liabilities of the
Joint Venture as of the date of its termination" as a separate
claim. Compl. ¶ 48. However, Sea Carriers omitted this
accounting claim from its Amended Complaint, as this Court noted
in its opinion granting Defendants' motion to strike Sea
Carriers' jury demand. See Sea Carriers Corp. v. Empire
Programs, Inc., 2007 U.S. Dist. LEXIS 7812, at *2 (S.D.N.Y. Jan.
26, 2007). The Plaintiffs' breach of contract claim was not
based upon any unpaid distributions, but asserted only that
Martin had "breached and repudiated" his obligations under the
parties' agreement by denying the existence of the alleged joint
venture.

Despite its having omitted the accounting claim from
the Amended Complaint, as well as from the parties' Joint
Pretrial Order, Sea Carriers seeks a judgment, based on evidence
introduced at trial, that it is owed $57,000 in unpaid net
profit distributions. Defendants contend, and the Court agrees,
that as the issue of unpaid distributions was not contained in
the Amended Complaint, it is not now properly before the Court.

During the parties' hearing on motions in limine, the scope of
the trial was limited to issues set forth in the Amended
Complaint, but the Court did state that it would entertain a
Rule 15(b) motion to amend the pleadings if the evidence
presented at trial gave rise to additional claims. Hr'g Tr.
31:4-17, Oct. 3, 2007.

Although Sea Carriers has not filed a formal post-
trial motion under Rule 15(b), Fed. R. Civ. P., it argues that
because the Court did not grant Defendants' motion to exclude
the evidence underlying its claim for unpaid distributions, and
because Defendants did not object to the admission of that
evidence into the record at trial, the distributions issue has
been tried by the consent of the parties. However, any failure
by Defendants' to object to the use of the documents supporting
its claim does not establish its consent to the trial of this
issue, as Sea Carriers' itself states that at least some of
these documents were introduced "to corroborate the loss-sharing
element of a joint venture." Pl's. Br. at 2. As the evidence
was relevant to claims contained in the Amended Complaint, the
fact that it may have also been relevant to the unpaid
distributions issue does not establish that Defendants were
aware that that issue had entered the trial. See United States
v. Certain Real Prop. & Premises, 945 F.2d 1252, 1257 (2d Cir.

1991) ("Whether a party has implicitly consented to the trial of an issue not presented by the pleadings depends on whether [the party] recognized that the issue had entered the case at trial.") (internal quotations marks and citation omitted).

Moreover, to amend the pleadings as Sea Carriers requests would prejudice the Defendants. See Sudul v. Computer Outsourcing Servs., 917 F. Supp. 1033, 1042 (S.D.N.Y. 1996) ("'Substantial prejudice may exist where it is not clear that the opposing party had the opportunity to defend against the new claim and where that party might have offered additional evidence had it known of the claim.'") (quoting Grand Light & Supply Co., Inc. v. Honeywell, Inc., 771 F.2d 672, 680 (2d Cir. 1985)). As the parties' joint discovery plan stated that it was "based upon the representation by Sea Carriers that its cause of action for an accounting between the parties [would] be voluntarily discontinued," Defendants assert that they did not pursue discovery with regard to the issue. Furthermore, Sea Carriers has offered no explanation for omitting the claim from its Amended Complaint and failing to seek a subsequent amendment prior to trial. Given the absence of clear consent by Defendants and the prejudice to them that would result from an amendment, the Court declines to construe the pleadings as amended pursuant to Rule 15(b).

**v.**    **The Connecticut Uniform Securities Act**

The Defendants have contended that Sea Carriers'
claims are barred for failure to register as an investment
adviser under the Connecticut Uniform Securities Act ("CUSA"),
Conn. Gen. Stat. Ann. ("CGSA") § 36b (2008). See CGSA §§ 36b-
6(c), 36b-29(h). As set forth in CGSA § 36b-29(h), "[n]o person
who has made or engaged in the performance of any contract in
violation of any provision of sections 36b-2 to 36b-33,
inclusive, or any regulation or order thereunder . . . may base
any cause of action on the contract."

As the Court has dismissed Sea Carriers' remaining
claims, it need not reach the issue of the applicability of the
CUSA.

**Conclusion**

Based upon the facts found above and the conclusions
of law, Sea Carriers' claims are dismissed.

Submit judgment on notice.

It is so ordered.

**New York, NY**
**June ʒ‑⊬, 2008**

ROBERT W. SWEET
**U.S.D.J.**